```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
                      CASE NO. 17-80045-CR-DMM


UNITED STATES OF AMERICA,

            Plaintiff,                    SEPTEMBER 27, 2017
      vs.
                                    WEST PALM BEACH, FLORIDA
TOMAS AARON JOHNSEN,

            Defendant.                      PAGES 1 - 29
_____/


                  TRANSCRIPT OF SENTENCING HEARING
            BEFORE THE HONORABLE DONALD M. MIDDLEBROOKS
                  UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE GOVERNMENT:   GREG SCHILLER, AUSA
                      Office of U.S. Attorney
                      400 Australian Avenue
                      West Palm Beach, Florida  33401


FOR THE DEFENDANT:    KRISTY MIITELLO, AFPD
                      ROBIN ROSE-EVANS, AFPD
                      Office of U.S. Public Defender
                      450 Australian Avenue
                      West Palm Beach, Florida  33401




REPORTED BY:          DIANE MILLER, RMR, CRR, CRC
                      Official Court Reporter
                      701 Clematis Street
                      West Palm Beach, Florida  33401
                      561-514-3728
                      diane_miller@flsd.uscourts.gov
```

Wednesday, September 27, 2017.

```
 1                      P-R-O-C-E-E-D-I-N-G-S
 2           THE COURT:  Good afternoon, please be seated.
 3           This is sentencing in the case of the United States
 4   versus Tomas Aaron Johnsen.  The case number is 17-80045.
 5   Could we have appearances?
 6           MR. SCHILLER:  Good afternoon, Your Honor; Greg
 7   Schiller on behalf of the United States.  Along with me is
 8   Special Agent Mark Gibbs from the FBI.
 9           THE COURT:  Good afternoon.
10           MS. MILITELLO:  Good afternoon, again; Kristy
11   Militello and Robin Rosen-Evans on behalf of Mr. Johnsen.
12           THE COURT:  Good afternoon.
13           Okay, I have reviewed the presentence investigation;
14   the plea agreement, the plea agreement called for a 360-month
15   recommended sentence, joint recommendation; forfeiture of an
16   iPhone and computer; an appellate waiver; and then an agreement
17   that the sentence run concurrent with a sentence in state
18   court.  There were some objections, a number of factual
19   objections.  It looked like only one affected the guidelines,
20   the obstruction of justice objection which apparently was --
21   the Government does not object, they agree with that objection;
22   and Probation says they will make that change assuming we order
23   it, which I will.
24           Miss Militello, are there any of the other -- most of
25   the other objections, I think by including them in the
```

Wednesday, September 27, 2017.

1  addendum, they seem to be resolved, aren't they?

2          MS. MILITELLO:  Yes.  The only remaining objections

3  really are to his supervised release conditions, and then there

4  were some factual objections that the Court is right, they

5  don't affect his guidelines, even though we resolved most of

6  those issues, but there are a few, and he would, for the

7  record, maintain those factual objections.

8          THE COURT:  Which of them and what's the -- I guess a

9  little bit, what's the point of those?  His position is set out

10  in the addendum, so do we need a ruling on some of these?

11          MS. MILITELLO:  I don't think so.  My concern is, I

12  don't want there to be a situation where he goes and does the

13  sex offender treatment either in BOP or after he is released,

14  and he is not, you know, agreeing to certain facts in the PSI.

15  So I think the fact, as Your Honor mentions, that our position

16  is noted in the addendum and that we maintain the objection,

17  that those certain facts are true.  It does cover him, as it

18  relates to those factual objections.

19          I just don't want a doctor to lead a review of this

20  PSI and say, well, you agreed to it then, why don't you agree

21  to it now and there be a factual disagreement.  So that's

22  really my concern as to those facts.

23          THE COURT:  All right.  What supervision issue is

24  left?

25          MS. MILITELLO:  There are a few supervision

Wednesday, September 27, 2017.

1  conditions that were made.  The first, I suppose, is the no-use

2  of data encryption software; and of course, Probation's

3  response to this is that, "We don't know what things will be

4  like at the conclusion of Mr. Johnsen's 30-year sentence."

5  There is truth to that, we don't know how technology will

6  change or really what society will be like.

7          However, data encryption software is becoming very

8  common place, and it is a little unclear what "data encryption"

9  would include.  Does that include two-step verification that

10  was widely used for banks and widely used for e-mail services?

11  So to say that no encryption would be used may prohibit him

12  from doing basic things like banking, e-mail, and protecting

13  his personal data.  So I think the restriction is too broad,

14  particularly in light of how quickly technology is changing,

15  and I think the fact that we can anticipate or continue to

16  advance before he is released.

17          Does the Court want to go one by one or should I go

18  ahead and --

19          THE COURT:  I mean, do you have a suggestion?  What

20  is Probation's view?  It is hard to deal with things that might

21  happen sometime in the future.

22          MS. MILITELLO:  Well, my suggestion is that he not

23  use any data encryption software that would be not otherwise

24  approved by Probation, so he would have to alert Probation as

25  to what he is using, and they would have to approve it.  He

Wednesday, September 27, 2017.

1  would have to give them the means to access the program or the

2  banking data or e-mail or whatever it is because we acknowledge

3  that they have a duty to conduct lawful searches and they need

4  the means to conduct those lawful searches so Mr. Johnsen would

5  have to give them the information to do that.  Notably in this

6  case, he did provide that sort of information to the Government

7  to allow them to search his devices.

8       THE COURT:  So you want use of data encryption

9  restriction not approved by Probation?

10      MS. MILITELLO:  Only that which would be approved by

11  Probation and that he would provide them the information to

12  access whatever the data encryption software is that they

13  approve.

14      THE COURT:  All right.

15      MS. MILITELLO:  As opposed to no data encryption, I

16  think there should be allowance for some sort of programs that

17  they may improve.

18      To computer modem restriction, again, I think a

19  ruling or a court order prohibiting Mr. Johnsen from using

20  internet at all is overly broad, and I mention that in my

21  motion.

22      Air conditionings connect to wifi now; TVs connect to

23  wifi; refrigerators connect to the internet.  So again, we

24  don't know what things will we like in 20 or 30 years, but it's

25  foreseeable that these basic devices used for living will

Wednesday, September 27, 2017.

```
 1   connect to the internet.
 2           To say Mr. Johnsen cannot have any device that would
 3   access the internet, I think, is an overly burdensome
 4   restriction.  And then I cited the case, of course, that the
 5   U.S. Supreme Court dealt with in a different context.  As the
 6   Government mentions, it was not a supervised release context.
 7   It was a state law that prohibited social media contact on the
 8   internet, and the court found that was in violation of the
 9   First Amendment because one might use social media for looking
10   at medical conditions online or to shop on Amazon, or do to a
11   number of lawful commonplace activities, and I think
12   Mr. Johnsen should be able to engage in lawful common place,
13   day-to-day activities.
14           So then my solution would be that he provide
15   Probation with access to his internet and browsing history.
16   Already, Probation has software that can monitor one's internet
17   activity; and so if they want to employ such software on his
18   devices, that would be fine.  And he could -- of course would
19   be required to surrender those devices to them for search, but
20   I don't think a blanket order disallowing him from using the
21   internet is appropriate.
22           THE COURT:  What is the Government's view of that
23   one?
24           MR. SCHILLER:  Do you want me to just address that
25   one, judge, or the encryption as well?
```

Wednesday, September 27, 2017.

```
 1          THE COURT:  Her encryption is only use of data
 2   encryption and restriction equipment not approved by -- only
 3   use of data encryption software approved by Probation, as I
 4   understand it, so I don't see a problem with that.  If
 5   Probation approves its use of it, then fine.
 6          MR. SCHILLER:  No, I'm in agreement, Judge.  I think
 7   with most of these conditions, Probation is in the best
 8   position to be able to determine whether the defendant is able
 9   and capable of handling these things.  And certainly, if they
10   object, it can always, you know, file a motion with the Court.
11          THE COURT:  But computer modem restriction, I'm not
12   sure what the solution -- how to solve that one.
13          MR. SCHILLER:  So it is an interesting issue, and I
14   filed a response to the defendant's objections at docket entry
15   36, and I outlined several cases that discuss this.  I wanted
16   to differentiate the Supreme Court case that the Defense
17   mentioned --
18          THE COURT:  Well, it was broader.  I mean, it applied
19   to everybody that was a sex offender.  There is a clear
20   distinction.  On the other hand, modems are a part of life.  Is
21   there a way to safeguard the public and allow somebody to use
22   it?
23          MR. SCHILLER:  I mean --
24          THE COURT:  She talks about some sort of monitoring
25   equipment.  I don't know if that's available and if that's a
```

Wednesday, September 27, 2017.

1  good solution or not.

2          MR. SCHILLER:  So I suppose it could be in certain

3  circumstances.  The Government's concern in this case is

4  twofold.  First of all, the case law would uphold the

5  restriction, and I cited United States --

6          THE COURT:  I think it could, but I guess the

7  question is whether --

8          MR. SCHILLER:  It should.

9          THE COURT:  -- it should.

10          MR. SCHILLER:  And well --

11          THE COURT:  In every case, I mean.

12          MR. SCHILLER:  Sure.  I think each case is

13  individual.  So my first point was going to be, legally, it

14  can; I believe it should; and the case law supports that based

15  on my response to their objection.

16          THE COURT:  He didn't really use the computer all

17  that much in this, did he?

18          MR. SCHILLER:  It was almost entirely.  So he was

19  using his phone to communicate with the victim; he was using

20  his computers to access Victor Network where he got child

21  pornography which, according to the PSR and the facts that have

22  been submitted to the Court, have been going on for a while.

23          The computers, when we got to his residence upon

24  arresting him in this case, several of those devices were

25  encrypted with multiple levels such that the Government would

Wednesday, September 27, 2017.

1  never have been likely to access them, so yes.  And even given

2  his profession, I mean, most of his life involves computers and

3  internet access.

4       So I would suggest that at least for the -- while he

5  is in prison, certainly he won't be able to; but when he gets

6  out of prison, it is going to be a situation where we don't

7  know what the world is going to look like yet because it is

8  going to be 30 years from now potentially.  I would suggest we

9  leave the provision in place and that if a need presents itself

10 that he has to have access to the internet for something, that

11 he can readdress it with the Court at that time, once he is on

12 supervised release.  But for now, I would say, because the

13 defendant's caliber of use of the internet, his expertise when

14 it comes to computers and the use of the internet, the safer,

15 more secure bet for the Court, for the victim in this case, and

16 the potential victim would be to uphold no-modem access on his

17 computer.

18       THE COURT:  All right.

19       MS. MILITELLO:  Your Honor, may I just -- and not to

20 reargue anything, I just wanted to clarify one thing.  The

21 Government said, while he is in prison, of course, he won't

22 have access, but that's not entirely true.  Prisoners do have

23 access to e-mail, both to e-mail their attorneys and then

24 certainly people that have to be approved by the Bureau of

25 Prisons.

Wednesday, September 27, 2017.

1          THE COURT:  Well, we are not dealing with that at

2    this point either way, are we?  There are no restrictions I'm

3    imposing today that apply while he is in prison.

4          MR. SCHILLER:  No, sir.

5          MS. MILITELLO:  I just wanted to clarify that.

6          THE COURT:  We are dealing with supervised release.

7          So on his computer modem, is there anything you all

8    know of that you think would solve your -- other than just the

9    outright restriction?

10         PROBATION OFFICER:  To be honest, Your Honor,

11   conservatively, we would ask that conditions be imposed as they

12   are written today.  We do not have the ability to, as we have

13   all discussed, decide how the future is going to be.  Perhaps

14   more of these conditions may need to be modified or perhaps any

15   modification we make today will again have to be modified in

16   the future.  So conservatively, the Probation Office would ask,

17   at this point, this is how we know that we can best supervise

18   sex offenders --

19         THE COURT:  I don't see the problem with changing the

20   data encryption software, as long as you all approve it, then

21   there is not a problem on that one.

22         PROBATION OFFICER:  Candidly, we would not approve it

23   at all.

24         THE COURT:  Well, you don't know what you will do in

25   30 years.

Wednesday, September 27, 2017.

```
1              PROBATION OFFICER:  Sure, absolutely.
2              THE COURT:  So the computer modem you think ought to
3  be left the same is your view?
4              PROBATION OFFICER:  It is a request of the Probation
5  Office that that condition remain worded the exact same.  And I
6  would note, in cases where we have defendants that do have the
7  need for it, whether it be for work or whether it be just for
8  personal circumstances, we visit those situations on an
9  individual basis based upon the individual's set of
10 circumstances, and those modifications can be made upon his
11 release from custody.  But we would just ask that we can make
12 those decisions at the right time, on some individual basis.
13             THE COURT:  Okay.
14             I'll change the data encryption one, but I'm going to
15 leave the computer modem restriction as is.  That can always be
16 he modified later.
17             Any other ones of these, Miss Militello?
18             MS. MILITELLO:  There is an objection relating to not
19 having conduct with minors.  In the way that it is written in
20 the presentence investigation report, that would include his
21 own daughter, and he may wish to have, as I mentioned --
22             THE COURT:  This doesn't cover -- the prison will do
23 whatever it does, and she won't be a minor when he gets out.
24             MS. MILITELLO:  Probably not.  I just don't want
25 there to be -- I'm sorry -- a problem where the prison applies
```

Wednesday, September 27, 2017.

1  the supervised release condition during his time in prison

2  because he should have the right, if all of the parties agree,

3  to e-mail or call her.

4         THE COURT:  Well, this section deals with supervised

5  release, not -- I don't -- it is certainly not my intention to

6  impact, one way or the other, how the Bureau of Prisons deals

7  with it.  They have their own rules, and I'm not going to be

8  trying to set forth any conditions with respect to how that

9  operates.

10         MS. MILITELLO:  Okay.  And then the last objection

11  was the standard condition for sex offense charges that

12  Mr. Johnsen not possess any adult sexually explicit conduct,

13  and I would ask that be left to whoever it is when he is on

14  supervised release that's conducting his sex offender treatment

15  because I don't think that's a appropriate in every particular

16  case, and him otherwise having legal adult pornography would

17  not be in violation of law.  So if he is getting treatment and

18  his -- the person he is taking treatment from approves it, then

19  I think he should be allowed to have such contact.

20         THE COURT:  How is it worded now?

21         MR. SCHILLER:  Judge, if I may, currently worded in

22  paragraph 126 on the presentence investigation report, "The

23  defendant shall not buy, sell, exchange, possess, trade, or

24  produce visual depictions of minors or adults engaged in

25  sexually explicit conduct."

Wednesday, September 27, 2017.

13

```
1              So if you look at the language the Defense objected
2    to, it is specifically "possessed visual depictions of adults
3    engaged in sexually explicit conduct."  I don't want to put
4    words in your mouth, but that's what --
5              THE COURT:  Would object to them taking it out "or
6    adults" from that?
7              MR. SCHILLER:  I would, Judge, just because there is
8    Eleventh Circuit precedence that says it is appropriate.
9              I cited in my motion United States versus Biggens,
10   664 Fed. App. 789, it is Eleventh Circuit case from 2016; and
11   if I can just quote the two sentences.  The court said,
12   "Biggens was convicted of producing and transporting child
13   pornography far from being devoid of mention of using and
14   abusing pornography, the record here resolves around its
15   production and use.  In other words, the use of pornography was
16   not merely incidental to Biggens' crimes but central to them."
17             The court -- then I wrote, "The court found the ban
18   of adult pornography 'reasonably related to the nature and
19   circumstances of the offense, the need to protect the public,
20   and the need to rehabilitate the defendant.'"  So they found an
21   exact similar ban to be appropriate as well, and I would ask
22   that the condition remain as is.
23             THE COURT:  I don't know if you watch Showtime or
24   Starz these days, you would -- you could run afoul of that,
25   couldn't you?
```

Wednesday, September 27, 2017.

```
1              Have you ever seen Banshee?  Are you a Banshee fan?
2              MR. SCHILLER:  I don't have HBO or Showtime, Judge,
3    unfortunately.
4              THE COURT:  I'm going to take "or adults" out.  The
5    Eleventh Circuit may -- I think it is too hard to date -- no
6    telling what things will be like when he gets out, but it's
7    hard to envision what we might be watching with respect to
8    adults.  So I think minors is what we are trying to get at.
9              Okay.  Does that cover it, Miss Militello?
10             MS. MILITELLO:  It does, Your Honor.
11             THE COURT:  Well, the sentence is agreed, 360 months,
12   right?
13             MR. SCHILLER:  That's correct.
14             THE COURT:  Both sides agree to that?
15             MS. MILITELLO:  Yes.
16             MR. SCHILLER:  Yes, Judge.
17        Judge, the Government did have the victim and her
18   mother here who did want to address the Court.
19             THE COURT:  Okay.
20             MR. SCHILLER:  Thank you.
21        All right, Your Honor, if I could call first, Miss
22   Melissa Williams.
23             THE COURT:  Unless you want, Miss Militello, them to
24   take the stand, they can doing that at the podium, right?
25             MS. MILITELLO:  The podium is fine.
```

Wednesday, September 27, 2017.

```
 1              THE COURT:  Good afternoon.

 2              MELISSA WILLIAMS:  My name is Melissa, and I am the

 3     mother of Jessica.  I appreciate the opportunity to address you

 4     as well as maybe say a few words to my -- who somebody used to

 5     be dear to me, as a best friend, Mr. Johnsen.

 6              So a couple things, I would like to say thank you for

 7     the speediness of this process.  I definitely appreciate the

 8     guilty verdict meaning that Jessica and myself didn't have to

 9     take the stand and testify or be a witness.  That would have

10     been a pretty difficult ordeal for both of us, so I appreciate

11     this being simple on us in that way.

12              And I understand that pleading guilty, you agreed to

13     the 30 years which to me seems like a lot considering the facts

14     of my daughter's case.  I understand there are some other

15     circumstances; and that be what it may, 30 years to me feels

16     like a lot.  I do understand that in 20 or 30 years, you will

17     look different, you will be older, and maybe what happened with

18     my daughter won't happen again because I think that maybe girls

19     would see you as an older man and wouldn't be so easily

20     manipulated.  So maybe that's the only hope that I -- that's

21     the only silver lining I can see for such a long sentence is

22     that, in time -- you know, the only thing I can see that would

23     be a good thing to come of the 30-year sentence.  But in

24     general, to me, I was taken by surprise.  It seemed like a lot.

25              The only thing I would like to say to you personally
```

```
 1   is that this is -- Jessica and I both aren't cheering in the
 2   back saying, woo hoo, 30 years, he is guilty.  This is definite
 3   a sad day.  It is a loss for both of us, for me especially.  We
 4   were friends for a long time.
 5           I struggled a lot with -- the past year with feelings
 6   of betrayal.  I was angry and sad and mad, went through all of,
 7   that; and I would think that as a friend to me, what I felt
 8   betrayed by the most is that there were times you were
 9   encouraging her to sneak out, lie to me, you know, do things
10   that weren't in her nature, and with her feelings towards you,
11   she became a person that was different.  I didn't know her in
12   that way, at that time.
13           It was a tough time period and I even went to you
14   last summer, and I said, "Hey, you know, I think Jess has a
15   little crutch on you.  I know she is just 16, and she is just,
16   you know, doesn't know any better, but if you can help remind
17   her it is inappropriate, you know;" and I feel like, at that
18   time, if you had -- I can't promise that the outcome would have
19   been different, but I would have appreciated you saying
20   something and coming to me with the truth at that time and not
21   finding out how I found out.  That was horrible.
22           With that being said, it still is a loss because you
23   were a best friend.  You were like a brother to me, so I do
24   feel a loss.  I miss our great friendship in that way.  I feel
25   torn because I am loosing a friend, but also, you know, I
```

Wednesday, September 27, 2017.

```
 1  wanted to obviously do what is right for Jess, and I appreciate
 2  the justice system doing the right thing and all of that.
 3          Greg had mentioned restitution and had asked me a
 4  couple times about that, but I would like to say we are not
 5  interested.  Even if Jess has to get counseling in five or ten
 6  years, whatever, anything that you can put towards your
 7  daughter -- like I don't want a penny, it wouldn't be right,
 8  you know.
 9          And I do feel bad for your mom.  I know that I'm
10  losing a best friend, and she is, more importantly, losing her
11  son.  That is horrible for everybody.
12          So anyway, I think that's all I have to say.  It has
13  been a tough year, and it kills me to sit here and look at you
14  like this; but then, you know, it just -- I wish what had
15  happened didn't happen, and I know that probably all of us wish
16  we could go back and not take those steps.
17          I think that's it.  Thank you for your time.
18          THE COURT:  Thank you.  I know it is a difficult
19  situation.
20          MELISSA WILLIAMS:  For sure.
21          MR. SCHILLER:  Judge, the victim in this case would
22  like to address the Court.
23          THE VICTIM:  So I only have one thing to say, and I
24  think the hardest part, not only did -- my friendship with my
25  mom was ruined for the most part.  So trust me, I will never
```

Wednesday, September 27, 2017.

```
 1   get it back here.  I'm grateful for an amazing mom, and she
 2   said she regrets because she was not one to -- I was not one to
 3   sneak around and lie to her and not be honest.  She is my best
 4   friend.  I tell her everything.
 5           I think one of the hardest parts was knowing you look
 6   me in the eye and said you love me, "You are the girl I want to
 7   marry, I want to have a future.  I want to move in with you."
 8   All of those were lies.  Oh, it is just temporary, maybe not
 9   forever, but you put false hope in my heart and now knowing
10   that it might last another year, two years, maybe if I was
11   lucky.
12           You know, once I was an adult, you were uninterested
13   knowing that you were best friends with my mom and I fell in
14   love with you, and you still wanted to break my heart like
15   that.  And what hurt the most is knowing that you hurt me that
16   you still would do it.
17           MR. SCHILLER:  Judge, if I could, there was one of
18   the -- it would have been a 404(b) witness in this case, who is
19   mentioned in the PSR, had written a letter.  I submitted it to
20   Probation.  I didn't know if Your Honor had a chance to read it
21   and she specifically asked me --
22           THE COURT:  I haven't seen that.
23           MR. SCHILLER:  Okay.
24           THE COURT:  I don't think -- it may have gone to
25   Probation.  I don't think it has been filed in the court
```

1  record.

2      MR. SCHILLER:  I didn't file it.  I didn't know if

3  Probation was or was not going to give it -- I gave it to them

4  just to supplement the PSR.  I have given it to the Defense.

5      In the PSR at paragraph 30, it is referred to as

6  "Witness Number 2," and she has written the following words, if

7  I can read it into the record.

8      She writes:  "To whom it may concern.  I'm writing

9  this letter today to share with you how Tomas Aaron Johnsen has

10 personally victimized me physically, emotionally, sexually,

11 intellectually, psychologically over the past 11 years.  I met

12 Tomas in the beginning of 2006 when I was under the age of 18."

13     For the record, Judge, based on our investigation,

14 she was about two weeks shy of her 18th birthday.

15     "I had never received my high school diploma.  He was

16 charming at first, when we began our relationship; but over

17 time, things began to change.  He began to change.  Compliments

18 turned into insults, and he would regularly chastise me for my

19 opinions, thoughts, or words.  The one statement that still to

20 this day haunts me is when he said 'you have no life experience

21 and because of that, your opinion and the things you say mean

22 absolutely nothing to me.'

23     "I was a young teenage girl barely a woman, and as

24 little esteem I had for myself was slowly being chipped away by

25 his venomous words.  The abuse started out with insults that

Wednesday, September 27, 2017.

1  were degrading and demeaning.  He would provide alcohol,

2  encouraging me to be flirtatious and then scold me the

3  following day calling me a slut or whore.  Over time, he began

4  to isolate me from the friends and family members who didn't

5  agree with our relationship.  He would push away anyone who

6  tried to tell me our age difference was wrong, and he would

7  fill my head with what he wanted me to believe.  I already had

8  a difficult relationship with my mother and Tomas" -- the

9  defendant -- "would fill my head with the belief that she was a

10  terrible person who I should cut out of my life entirely

11  because she was a 'useless and selfless person with no

12  redeeming qualities.'

13       "He had a sexual appetite that he was never able to

14  satisfy.  Even if we had sex, he would still need to masturbate

15  throughout the day.  It added to insecurities of feeling like I

16  wasn't good enough.  I was never good enough; and if I didn't

17  feel that way, he would be sure to remind me either verbally or

18  through his actions.  He would always try and cover up his

19  deviances with excuses that he would never hurt someone, he

20  would never act on his desires, they were merely fantasy and

21  they weren't real; but, he did hurt someone before me.  He hurt

22  me and he hurt someone after me.  I truly believe he is nothing

23  short of a predator.

24       "The worse of the sexual abuse would be after a night

25  of drinking.  He would encourage me to drink until I was unable

Wednesday, September 27, 2017.

1  to consent and he would allow other men to force themselves on

2  me.  Then he would tell me the next day that it was what I

3  wanted and it made me -- made him so happy to see me happy.

4  Pretending that was the truth, his lies, felt like the only way

5  to emotionally survive these assaults.

6          "For the majority of our relationship, Tomas refused

7  to get a job.  He would spend his days at home on his computer

8  playing video games or pleasuring himself.  He would require me

9  to purchase the food we ate and promises that next time, he

10  would find a way to pay to make some money to pay me back.

11          "He would allow the electricity to go off and demand

12  I pay the bill, or we would have to go without.  He would need

13  me to cover half of his rent multiple times, and he relied on

14  me financially for entertainment as well as living necessities.

15  The final apartment we lived in together right before I escaped

16  the horrible relationship, I felt stuck in.  I left the full

17  security deposit and even paid the final month rent before the

18  lease expired because I couldn't stand to be under the same

19  roof with him for a minute more.  He used the excuse of wanting

20  to repay his debt to me for years as a manipulation tool to try

21  to get my attention.  Being repaid the money is an

22  insignificant inconvenience compared to having to hear or speak

23  to him ever again.

24          "After I left is where the abuse turned to fear.  He

25  would show up at my office with reasons or excuses.  He would

Wednesday, September 27, 2017.

1   text me at all hours of the night and day.  He would even send

2   messages to my younger sister in hopes of reaching out to me.

3   I was terrified of seeing him or running into him.  I didn't

4   want anything to do with him ever again which I said -- which I

5   had said on numerous occasions but he never he stopped trying

6   to get in contact with me even to this day.  I once received an

7   e-mail sent with my e-mail name but copied to multiple

8   different domains on the off chance I had switched my e-mail to

9   Gmail or Yahoo.

10          "Right after his October arrest, through Facebook, he

11  sent a message to my little sister trying to reach out to me.

12  This happened regularly for the past eight years since I got

13  out.  He never stopped trying to get in contact with me.

14          "I was never able to talk about the things that

15  happened during the two to three years I dated Tomas because I

16  didn't think anyone would believe me.  I didn't think anyone

17  would be able to do anything, and I didn't think he would be

18  caught.  I had lots of photos he had taken of me, some with

19  consent, others without my legal consent.  This allowed him to

20  control that fear and power he had over me."

21          Finally, she says, "The emotional toll the sexual

22  abuse has taken on me has caused me to become extremely

23  codependent on the attention of others.  It was years before I

24  even began to understand what a healthy relationship was.  It

25  caused me to go in a downward spiral of addiction, and it

1    blocked me for having any real connection with people for a

2    long time.  I kept others at a far distance and would allow

3    only myself to experience shallow and informal acquaintances.

4    I couldn't trust anyone.  I couldn't trust myself.  I was also

5    very confused about the entire situation.  I felt alone, I felt

6    abandoned, and I felt like everything that happened to me was

7    my fault because I let it happen, and it was what I deserved.

8          "In the time, I felt like he loved me, but he was

9    older and wiser and this was how adults were supposed to be;

10   but, in hindsight, he wasn't an adult.  He was an opportunistic

11   sexual defiant, and I fit perfectly into his trap.  I was a

12   pawn for his games.  The only silver lining for me having to go

13   through everything I went through is knowing he will finally

14   meet his judgment day and will hopefully never be able to hurt

15   another girl again."

16         Thank you, Your Honor.

17         THE COURT:  Thank you.

18         MR. SCHILLER:  That's all the Government wanted to

19   present for sentencing.

20         THE COURT:  Let me ask you about this.  Probation had

21   said the victim's losses were not yet ascertainable.  Are there

22   victims other than -- the victim here has said they are not

23   interested in restitution.

24         MR. SCHILLER:  Right.

25         THE COURT:  So is restitution an issue or not?

Wednesday, September 27, 2017.

24

```
 1              MR. SCHILLER:  I don't believe it is, Judge.  We
 2   reached out to the other I'll call them witnesses, but they
 3   were certainly victims who the Government was potentially going
 4   to present at trial, if that was allowed; and they did not
 5   express to us any restitution interest, at this point.  So at
 6   this point, I can't say there was any restitution interest that
 7   is to be sought.
 8              THE COURT:  All right.
 9              MR. SCHILLER:  Thank you, sir.
10              THE COURT:  Thank you.
11              Miss Militello, we have the agreed recommendation.
12   Is there anything you want to present other than me turning to
13   Mr. Johnsen.
14              MS. MILITELLO:  No, other than to say I don't think
15   the Government is entitled to seek restitution.
16              THE COURT:  He just said they were not.
17              MS. MILITELLO:  Right, of the other victim's
18   testimony.
19              I know Mr. Johnsen disputes some of the facts that
20   were made in that statement.  I didn't object to them because I
21   think the Court lawfully can consider it, even though it is
22   hearsay.  So I think he wants to address that with the Court
23   and maybe a few other things, but we don't have any further
24   witnesses or argument.
25              THE COURT:  Well, Mr. Johnsen, I want to make sure
```

Wednesday, September 27, 2017.

1  you know you have the opportunity to speak.  You are not

2  required to speak, but you have that opportunity, if you would

3  like.

4           Just pull the microphone over for him, if you would,

5  Miss Militello.

6           THE DEFENDANT:  It is hard for me not to dispute 90

7  percent of what I have just heard because I think that it's a

8  wild misrepresentation, but I think that I have done a lot of

9  wrong things.

10          And although it hurts me that you believe that I was

11 lying, I think it might be better for you to stick to that.

12          And, Melissa, that day won't go by when I don't

13 regret what I did.  I'm truly sorry.

14          That's all.

15          THE COURT:  All right.

16          I have considered the statements of all parties, the

17 presentence report which contains the advisory guidelines and

18 the statutory factors.  I adopt the findings of the presentence

19 investigation report.

20          I note that the defendant, with respect to certain

21 factual issues, has stated a position contrary to some of the

22 facts, not the essential facts as to this crime but some

23 others, and the addendum addresses his side of that which is

24 available in the event of -- at the time of any treatment.  So

25 I adopt the statements as in the addendum as well.

Wednesday, September 27, 2017.

1         The offense level is 42, the criminal history

2   category one, the advisory guideline 360 months.  The parties

3   have made a joint recommendation of 360 months; and in light of

4   all of the factors, I find the recommendation to be reasonable.

5         It is the finding of the Court, the defendant is not

6   able to pay a fine.  It's the judgment of the Court that the

7   defendant, Tomas Aaron Johnsen, is committed it the Bureau of

8   Prisons for 360 months.

9         Upon release from imprisonment, the defendant shall

10  be placed on supervised release for a term of 25 years.  Within

11  72 hours of release, the defendant shall report in person to

12  the probation office in the district to which he is released.

13  While on supervised release, the defendant shall comply with

14  mandatory and standard conditions of supervised release which

15  include not committing any crimes, being prohibited from

16  possessing a firearm or other dangerous device.  He shall not

17  unlawfully possess a controlled substance, cooperate in the

18  collection of DNA and comply with the following special

19  conditions:  The permissible computer examination; he shall

20  only use data encryption software which has been approved by

21  Probation; the computer modem restrictions; employer computer

22  restriction disclosure; no contact with minors; no involvement

23  in youth organizations; sex offender treatment; restriction

24  from possession of sexual materials, however, I am going to

25  remove the limitation with respect to adults which is included

27

1  in paragraph 126 of the PSI; the Adam Walsh Act search

2  condition; sex offender registration; the permissible search

3  requirement and support of the appended, all noted in part G

4  the presentence report.

5          The defendant shall also pay to the United States a

6  special assessment of $100.

7          So the total sentence is 30 years imprisonment, 360

8  months, 25 years supervised release, $100 special assessment;

9  forfeiture of the defendant's right, title, and interest in the

10  iPhone and computer equipment set forth in the plea agreement

11  is hereby ordered consistent with the plea agreement.

12          Now that sentence has been imposed, does the

13  defendant or his Counsel object to the Court's findings of fact

14  or the manner in which sentence was pronounced?

15          MS. MILITELLO:  We would just bring you the modem

16  restriction as part of supervised release.

17          THE COURT:  All right.

18          Mr. Johnsen, your plea agreement contained a waiver

19  of your right to appeal.  Under the normal rules, however, you

20  would have such a right but any notice of appeal would have to

21  be filed within 14 days.  Failure to file a notice with within

22  that period would constitute an additional waiver of your right

23  to appeal.

24          Do you want me to make any recommendation to the

25  Bureau of Prisons?

Wednesday, September 27, 2017.

1          MS. MILITELLO:  Yes.  And this is unusual, but I

2    think it would be a joint recommendation to have him in the

3    Southern District of Florida.  Although we don't want this part

4    of the judgment, but we will tell the Court why.  He is

5    cooperating with the federal government, and so I think he is

6    more use to them if he remains local.  So instead of it just

7    being a defendant's request, maybe the Bureau of Prisons will

8    give it more weight if the judgment can reflect --

9          THE COURT:  So a recommendation as close to South

10   Florida as possible?

11         MR. SCHILLER:  Yes, sir.  The Government would join

12   in the request to keep Mr. Johnsen in a South Florida facility

13   as possible or as close to the Southern District of Florida as

14   possible.

15         THE COURT:  I'll make that recommendation.

16         MR. SCHILLER:  I just want to bring up one more

17   point.  I know you ordered 100-dollar special assessment.

18   Because of the crimes, he is eligible for the $5,000 special

19   assessment unless you are finding the defendant indigent for

20   that purpose, then it would be the 100-dollar.

21         THE COURT:  You had said, because I think you

22   anticipated restitution, he couldn't pay a fine.

23         PROBATION OFFICER:  Well, Your Honor, in light of the

24   fact that the restitution is not an issue at this point, I

25   would point out that the defendant was declared indigent by the

Wednesday, September 27, 2017.

1  magistrate judge and therefore appointed the Federal Public

2  Defender, so Your Honor could make a similar finding and the

3  defendant therefore would not be able to make the 5,000-dollar

4  special assessment.

5          THE COURT:  In view of his indigency status, I think

6  the $100 is appropriate.

7          Good luck to you, sir.

8    (PROCEEDINGS ADJOURNED AT 3:09 p.m.)

9                    **C-E-R-T-I-F-I-C-A-T-E**

10          I hereby certify that the foregoing is

11      an accurate transcription and proceedings in the

12      above-entitled matter.

13

*1/14/2019*                    */s/DIANE MILLER*
14   DATE                    DIANE MILLER, RMR, CRR, CRC
                             Official Court Reporter
15                           United States District Court
                             701 Clematis Street, Room 259
16                           West Palm Beach, FL  33401
                             561-514-3728
17

18

19

20

21

22

23

24

25

Wednesday, September 27, 2017.